## Ex Parte Thomas J. Warren.

The 1st section of the "civil rights" law gives negroes equal rights with whites to give evidence, and they are competent witnesses. (Paschal's Dig., Art. 5382.)

By the reconstruction laws the government of Texas is "provisional," and "subject in all respects to the paramount authority of the United States;" and, the commanding general having ordered that there should be no distinction on account of color as to witnesses, the court can make no distinction.  (Paschal's Annot. Const., p. 82, § 3; p. 286, preamble, &c.)

[See the facts on which the court held a homicide to be excusable, and discharged the prisoner on *habeas corpus.*]

The case was one of original jurisdiction upon *habeas corpus.*

No briefs have been furnished to the *Reporter.*

CALDWELL, J.—The applicants are accused of the murder of James Bates, in the county of Smith, on the — day of April, 1868, and were committed in default of bail, the former in the sum of $50,000, the latter in the sum of $20,000.

They have been brought before this court as upon *habeas corpus,* and the case of Wiley Adams submitted upon the written evidence taken before the committing magistrate, the evidence being the same in both cases up to the submission of the cause of Adams.

After a careful examination of the evidence, stimulated no less by the gravity of the charge than the enormous bail required of a negro, equivalent to a denial, we have no

hesitation in declaring that there is no ground upon which the continued restraint of Wiley Adams can be maintained. The evidence discloses no "probable cause" to believe that he has committed an offense, and he is therefore discharged.

At this stage of the examination counsel for the remaining applicant proposed to introduce as a witness the discharged applicant. Counsel for the state (not the attorney general) objected to his competency, on the ground that he was of African descent and within the degrees prohibited by a statute of this state.

It would be a sufficient reply to refer to an act of Congress, commonly called the "civil rights bill." We will add, however, that our present state government is provisional only in its character, and "subject in all respects to the paramount authority of the United States." Being thus "subject," and the act above referred to having been given us as a rule of action by the commander of the fifth military district, it would seem that there is no room left for doubt. The witness is competent.

The evidence of Wiley Adams having been heard and considered in connection with that sent up by the magistrate, we will now proceed to give the result of our conclusions in Warren's case.

The applicant is guilty as charged, or it is a case of excusable homicide. There is no middle ground.

The proof is evident that Warren was greatly enraged in consequence of some indignities inflicted on him the preceding evening by persons in disguise, unknown to him, and early in the morning, still breathing vengeance against those who had outraged him, went in quest of them.

In this frame of mind he took his seat on the fence where the tragedy occurred. It is also in proof that the deceased was at the house where Warren had been insulted, (though not at the same time,) and was guilty of some rudeness towards those engaged in the dance. It nowhere

appears that they were at the house at the same time or that Warren suspected deceased to have been among those who had wronged him.

It is true that Warren called at the lodgings of deceased, and asked if he could be seen; but, from what subsequently passed between them, the presumption is that his object was to make inquiries for his enemies. The deceased learned in the morning that Warren had been seeking him, and, on being informed of his whereabouts, approached and took a seat on the fence beside him. Their morning salutation was such as is usually observed between friends. Their greeting was quite cordial. The applicant soon introduced the subject uppermost in his mind, and asked the deceased if he knew the persons who insulted him the night before. Deceased denied any knowledge of them. Warren expressed himself satisfied, and further remarked, that deceased could not have been there, or he would have prevented the gross insult which had been offered him. Warren, in continuation, observed that he knew one of them, alluding to Doc Roberts; and said, if he would come out on the square, and had any fight in him, it would be all right. It should be borne in mind that deceased had separated from Roberts only a few moments before at his store, and after the deceased had received the fatal wound from Warren [Roberts] sent for and obtained possession of the pistol which had been used by the deceased.

When the applicant made the last remark about Roberts, the deceased jumped off the fence, averring that he had stood as much of that as he intended, (or words of similar import,) and facing Warren, with pistol drawn, fired at him. Before deceased fired, Warren, still on the fence, with his right arm uplifted and with an open palm, told the deceased not to "do that," or he would shoot him.

After the first fire of deceased Warren drew his revolver and, simultaneously (or nearly so) with his antagonist, fired.

The firing continued until each had exhausted his shots, deceased gradually retreating.

One shot only took effect on the deceased, and from the range of the ball and attitude of the parties we are inclined to believe that it was the first shot fired by Warren.

We arrive at these conclusions after a very careful consideration of the evidence, which is somewhat conflicting, though in no material point, and in minor points not more so than is usual where a large number of witnesses testify from different points of observation, whose attention had been directed to the occurrence at different periods of time and by dissimilar objects.

If we have taken a correct view of the facts, of which we have no doubt, the application of the law is not difficult.

If the applicant, acting upon a principle of revenge, sought this occasion for the purpose of injuring the deceased, or if, in the pursuit of, or attack upon, some object of his vengeance, he committed the homicide, it would be murder. Not so is the fact. He was in the company of one whom he regarded as his friend, one against whom he harbored no resentment, nor did he recognize the presence of any against whom he had malice. He was not there in pursuit of his supposed enemies. The attack which he made was to repel an assault upon his person as unexpected as is was deadly. It cannot be presumed that the defendant acted upon deliberation and formed design, and is therefore not guilty of murder. He could not have been moved by sudden passion, because the deceased made a deadly assault upon him. It is therefore not manslaughter. The principle of excusable homicide, familiar to the profession, comes to his aid, and entitles him to his discharge.

It is therefore ordered that the applicant, T. J. Warren, be discharged from custody and go hence without day.

APPLICANT DISCHARGED.